Good morning, Your Honors. May it please the Court, my name is Brett Stecker, and I'm here today on behalf of the plaintiff, Appellant Sanjay Israni. Okay, and if you can keep your voice up, please. Sure. Counsel, I've got a couple of questions for you on this case. Certainly. I'll tell you what both of them are so you can structure your time and address them. One is, I don't see why futility should be easy to demonstrate. The reason why not is it's so easy to make a demand. It's kind of like, oh, I don't know if you know about these or not, but in Federal Tort Claims Act cases, you have to make a demand on the agency before you can sue under the Federal Tort Claims Act. The agency blows it off. They don't even answer in most cases. Likewise, many municipalities and states have a demand procedure, and it's the same thing. You make it, you send a careful letter stating your demand, you don't even get an answer. And after a certain number of months of being ignored, you're allowed to file a suit. I don't actually see why the futility exception to the need to make a demand on the board should be interpreted liberally, because it's so easy to make a demand, even if you know it's probably a waste of time, just like in the Federal Tort Claims Act demands. My second question is, I keep trying to add up to nine, and I keep getting a little lost because of the overlaps of categories. I have to add up to at least, what is it, five of the nine directors, I think, on whom the demand would be futile. And I'd like you to just take it with me by name and show me five of them who are so obviously interested that the demand would be futile. Certainly, Your Honor. With respect to your first question, the demand futility test is a difficult test, and it should be a difficult test. It's not supposed to be an easy test, and we would never say that it is. However, under Delaware law, which controls here because this is a Nevada corporation, but the Nevada Supreme Court has adopted the Delaware demand futility test, there are certain limited circumstances under which a shareholder is relieved of the burden of making a demand. It is a difficult test. These circumstances are rare, but certainly this Court has recognized that such circumstances exist, most recently in the Lynch v. Rawls case, which was decided earlier this year. The facts of that case and the rationale why demand was excused is very different than what we are arguing today, but certainly it serves as an example. Okay. We're on the same track so far. It's a high hurdle, but some people get over it. Certainly. It's a very high hurdle. There are circumstances where demand is excused and in response to that. Tell me something, now. On the various justifications that would get you up to five of the nine, a critical one is what the members of the board get. And my experience with boards on what I know about them, not being on them, for corporations that are not top 200 on the New York Stock Exchange or something like that, is the board members often get $10,000 or $20,000 per meeting, sometimes get $2,500 a meeting, an awful lot of money for just going to a meeting. We go to court meetings. It's not that big a deal, and there's preparation involved and responsibility. It seems like a lot of money. Some of these people get $400,000. That kind of blows me away. On the other hand, it's not a very respectable business selling slot machines to casinos, and in order to get a respectable person to lend his name to the not-so-respectable business, you probably have to pay him more money if you want to get some big names on your board. But I didn't see in your comparison what members of other boards and comparable businesses get. There are businesses where it kind of adds to your resume that you're on the board instead of detracting from it. Your Honor, I'd like to go back to your second question, and I think that will help me answer the question that you just raised. First, with respect to the breakdown of the board, just so that we're all in agreement on how the numbers would shake out if the court were to accept the plaintiff's theory, there are two inside directors on this board. That means they are directors that are full-time employees of IGT. It is a black-letter principle under Delaware law that directors who work full-time as officers of a corporation are not independent for purposes of a demand. So you need three more. So we would need at least three more. That's correct. There are four outside directors, meaning directors who work in what's typically a part-time capacity as directors of the company, who we allege received director compensation which far exceeds what is usual or customary director compensation. Okay. Did you show what is usual for customary director compensation in comparable industries? We did not. We don't believe that that's the test under Delaware law. Under Delaware law, what it says is that if a director receives a fee which is more than what is usual and customary, and there's no reference to industry, but I will get back to industry, that that could be reason enough that it has to be. I mean, the hourly rate that's usual and customary is different for plumbers and lawyers. It may be higher for plumbers, but it's probably different. Well, again, under Delaware law, we don't think that that's a requirement, but let's assume that it was just for purposes of the argument. At this stage, the pleading stage, the plaintiff is entitled to all reasonable inferences. The reasonable inference, if, as the Court posits, IGT would have to offer unusually high director compensation in order to attract and retain reputable directors, then the reasonable inference is that they're offering an amount of money that would be material to those people, that would cause them to want this job as an outside director of IGT, that would cause them to want to keep that job as an outside director of IGT. The Delaware principle that holds inside directors non-independent for futility purposes is based on a common-sense principle, which is that, you know, I'm attracted to the idea, anybody who gives you $400,000, you're kind of loathe to stick your thumb in his eye. It makes practical sense to me. But I still don't quite see why I have to just presume that they're just like an employee, because there doesn't seem to be any black-butter law that says so. There is not, Your Honor. And in some respects, this is a case of first impression with respect to the director fees. Under the Delaware independence analysis, the courts say that the analysis has to be contextual in nature. That means that the court has to look to the precise situation at issue. And this is where we think that the district court went wrong. We gave the court, and we've given this court, reasons why you can put the director fees of more than $400,000 in context. And when looked at them in context, it's easy to conclude that these fees exceed what is usual or customary and that the directors are likely to consider them and to consider the fact that they would like to continue to receive these fees in response to a demand. First, we compared IGT's director fees to that at the largest corporations in this country.  The Delaware law unusual and customary, it struck me as a little bit funny. It seems to me what would tend to bear on independence or not independence is not whether you're getting the same money anybody else would get, but whether the money is enough to sacrifice your integrity for it. And that could be a customary amount. For example, if it's customary that directors of companies with over $10 million in revenue give their directors a half million each, well, a lot of people are going to be a little on the shady side as far as integrity goes for that much money, even if it's customary. It's kind of like an employee who makes his whole living that way. Well, the question — Is Delaware law clear that we just look at usual and customary, not quantity? What Delaware law says is that if the fee is shown to exceed what is usual and customary, there can be reason to doubt the director's independence. So a benchmark is usual and customary, and that's that, not quantity. A benchmark is what's usual and customary. Okay. If it is usual and customary, I don't see why I wouldn't be forced to reject your argument because you haven't shown what's usual and customary in the industry. Again, the cases don't say that we have to show what's usual and customary in the industry. The cases say that you have to show what's usual and customary for director fees. Are any of those cases such as to suggest a distinction by industry? They are not. No, they are not, Your Honor. Not that we're aware of. However, even if they were, we have submitted in our reply brief information that shows that IGT's director fees are actually high amongst its own self-admitted peers per its own public filings. We've also presented the Court with a Fortune magazine study of director compensation across the board. They looked at nearly 500 companies, and they concluded that at less than 5 percent of those companies, there was outside director compensation that averaged more than $400,000. Fortune magazine called this the nosebleed level. IGT's outside directors are being paid at the nosebleed level, and we submit that under any reasonable analysis, that would give a reasonable shareholder reason to doubt those directors' ability to independently consider a demand. If you make a demand on the board and the board refuses, what happens? What's the next step? If the board refuses and if the refusal is improper, the stockholder has the right to bring what's called a demand refused lawsuit. The demand refused lawsuit is a particularly difficult lawsuit to bring for the shareholder because the board has the presumption of business judgment in refusing the demand. So really all that the shareholder can say is that the board went through an improper process in refusing the demand. That is a very difficult test. The reason that you want a futility determination is a presumption switches against you if you make a demand and it's turned down. Well, yes, that presumption is against the stockholder, that's true, and in favor of the board, that the board acted properly in its business judgment in refusing the demand. So really the only things that are at issue in a demand refused lawsuit are whether the board went through the proper steps in refusing the demand. Again, we don't know if the board acquiesces to the demand, they might hire somebody else. That's certainly true. So I'm just trying to figure out the incentives on each side as to why you would prefer to say, listen, the demand is going to be futile because if they refuse, you've got a different kind of lawsuit that's going to be hard to win, and if they say yes, they may not hire you to bring the lawsuit. All of that's true, but that's not why in this instance a demand futility lawsuit was brought. In this instance a demand futility lawsuit was brought because in your view it's futile. It seems reasonable that a reasonable shareholder would doubt that this board could independently consider a demand. In order to get up to five, which is the number you need to get to in a nine-person board, do we need to agree with you that the compensation is too high and therefore we don't have the presumption of neutrality, or do you have other grounds in addition to the excessive, what you view as the excessive compensation? No. First of all, the court does not have to agree that the compensation is too high. The court simply has to find that the compensation exceeds what it is. No, no. You didn't understand my question. You need to get up to five. In order to get up to five, do we need to determine that the fact that this compensation is so high, which then leads us to say that they're insufficiently reliable, do you need to convince me that that's so, or do you have other grounds on which you want to convince me that these directors are not neutral and it would be futile to demand them? There are other grounds upon which plaintiff submits that demand is excused in this case or should be excused, most important being that the audit committee, the members of the audit committee who are five members of the board, and in itself that's a majority, are substantially likely to be held liable for breaching their fiduciary duties of loyalty and good faith in connection with issuing the false and misleading statements that the plaintiff has challenged. And I assume they've got insurance. I presume the same thing, although we're not at that point in the lawsuit where I can comment on it. But if I'm trying to figure out how worried they're going to be about a lawsuit being brought against them, one of the things I wouldn't worry about is, well, how worried are they really and how much might that affect their say yes or no, and if they've got the customary insurance, that's a damn nuisance, but they're not going to have to pay. Your Honor, I have about a minute left, so I'd like to reserve it for rebuttal, but I will answer the question. The Court may or may not be aware, and if it is not, we'd be happy to submit a supplement, that in the related securities class action in the District of Nevada, after the briefing in this matter was closed, the District of Nevada found that the same false and misleading statements that are challenged in that action as in this action were sufficiently alleged under the materially heightened PSLRA standards to have been false and misleading and to have been issued with scienter. Under Delaware law, audit committee members who are responsible for overseeing and for issuing and reviewing false and misleading statements, at a minimum, under Ryan v. Gifford, at a minimum, they face a substantial likelihood of liability and demand is excused on that basis. So, again, even putting aside the issue of independence as it relates to the inside directors and the highly paid outside directors, demand would be excused on that basis. Okay, thank you. Now, we've taken you up to 14 seconds. We'll give you a chance to respond. Thank you. May it please the Court, I'm Boris Feldman, Wilson's son, Sini Goodrich and Rosati Palo Alto, California, for the appellees. Let me begin with a couple of corrections. When counsel closed by saying that Judge Reed, who also had this derivative suit and the shareholder class actions, upheld the complaint in the class action, that's not against any of the directors he said should be afraid of liability. It was only against two defendants, not the outside directors. So to the extent that What did he hold? What was the ruling on a factual matter? Well, it wasn't factual. It was a motion to dismiss. Okay. The outside directors weren't on the hook. There were some inside employees that he kept in on very discreet issues. But that case isn't before you. It's being litigated, but to suggest that he can get to the magical five by saying the outside directors are worried about liability. They're not in the class action. Both of you have described what Judge Reed did in that case in terms that I'm not fully able to understand. Can you give it to me in terms that I can? What precisely was at issue that he's referring to and what precisely did Judge Reed hold? Well, the question that you directed to counsel that he was responding to by summarizing the other case was that there was a substantial risk of personal liability for the outside directors. And that's how even if you reject his new theory of paid too much. I understand. I asked you a specific question. What is it that Judge Reed held in this other case? Motion to dismiss for failure to state a claim granted in its entirety except as to two statements, as to I believe there are two individual defendants there, not the outside directors. And what were those alleged statements? One involved whether a downturn in play levels at the casinos, which affects this company's revenue, was attributable to seasonality or the macroeconomic environment. That was one. And the second issue was whether on a contract for new equipment at a fabulous new casino in Las Vegas called Aria, part of City Center, the company adequately disclosed that it wouldn't have revenue until later years in the contract. Those are the only two statements left in the case. So to suggest that the audit committee is going to get hanged here because the class action is going, there was no financial restatement. There were no certified financials that are challenged. In addition, Nevada law differs from Delaware statutorily in one important respect. In Delaware, the exculpatory clause with which your honors are familiar has a carve-out for recklessness. In Nevada, you can only establish liability of a director by statute if they intentionally and knowingly engaged in misconduct. So to suggest that you can get to five by saying, well, there's a class action going on, not as to those outside directors. The other error I want to clean up, because I'd hate to see an opinion in which this court assumes that the standard in Delaware is ordinary, usual and customary, I think is the phrase that Judge Kleinfeld used, picking up. Not at all. That's not the test in Delaware at all. The case that discussed it is in. I'm going to get to the point. We're just waiting for you to finish your sentence so we can ask some questions. What is the standard? The standard is nothing special. There's no different standard based on director fees. It's half the plaintiffs adequately pleaded facts that raise an inference that the directors couldn't be independent. There's no special branch of Delaware law based on fees. Not at all. Let me ask you a couple of questions that are on my mind. First of all, is there evidence in the record one way or the other on whether the directors have, directors and officers, liability coverage, what its deductible is, whether there's any indemnity, whether there's evidence that would tend to show that they would be indifferent to a monetary award against them? There's no evidence in the record. Okay. My next question is I looked at those fees, like $400,000, and I was not impressed with the comparison with what the top companies on the big board pay directors because I would think a lot of people would treat it as a big honor to be on some of those companies, and they actually take less money than they would be for a company that makes slot machines for casinos. But the only evidence that I think was in the record on the gambling business was about Bally's directors. Is there anything else in the record about what the directors of comparable companies make? No. Your Honor is correct. Supplemental excerpt of record 17, Bally, which is an almost identically situated company, it paid its directors in 2008 an average of $418,000. That's SCR 24. IGT's average was $419,000. Now, let me ask you about those numbers. The whole point of looking at the numbers and the whole point of creating a presumption for employees is to have some kind of very rough rule of thumb for who you would expect to protect the company even if it's wrong. The idea with an employee is it's his whole livelihood. It's how he supports his family, pays his mortgage, sends his children to school. You have to cut that guy some slack in terms of what you expect him to do to protect the shareholders. You have to assume he's going to shade his responsibilities a little because of his dependence. Now, $400,000 strikes me as so much money that you'd sort of expect the same thing. People are not going to be eager to give up $400,000. I know millionaires, multimillionaires. I know some pretty rich people, actually, who argue about much smaller amounts of money. People argue about all sorts of things, Judge Kleinfeld, but you're not the Nevada legislature. It would have been very easy for the Nevada legislature, when they created the shareholder demand requirement, to say, however, notwithstanding the foregoing, if directorial compensation exceeds the median in the relevant peer group, no presumption shall apply. Isn't the measure just whether compensation is such as to cast doubt upon the independence of the individual? No, absolutely not. In fact, on the contrary, Delaware law has repeatedly stated the fact that directors are getting paid a lot does not raise an issue. What's the standard? I was directing the court's attention a few minutes ago to the decision that they said involves usual and customary, because it's very instructive. In re national auto credit and shareholder litigation, if I can get my iPad to behave, 2003 Westlaw 139768 at star pages 5 to 6, 11 and 14. That was the chancery court. And that's where he got the language. Quote, if I may, it is not that the director's fees are large amounts paid on a regular basis. Rather, the director's fees were the product of massive increases granted in return for the defendant director's support of the McNamara Employment Agreement and the Zoom Lot Agreement, all at a time while national auto was transitioning to a passive corporation with no active business to manage. Therefore, there's nothing usual and customary about the director's fees. They were saying that here there was a quid pro quo. In our case, by contrast, there's not even an allegation of a quid pro quo. There is a request. Counsel was candid. He wants you. Is there a statement of what the standard is? In the quote that you just read, they were explaining that in a particular case, the director's fees were quid pro quo. They seem to be saying in the comparative part of the statement, usual and customary. Is usual and customary the standard? Not at all. No, it's never been the standard. There is no separate standard based on director compensation. There is no case. We pointed this out below. Judge Reed found it, and we've pointed it out in our briefs here. There's no precedent that the appellants can point you to in any court ever that said because the directors routinely got paid a lot, they're not qualified to rule on demand. And if you were to hold that, if you were to rule that Judge Reed abused his discretion, which is your standard, by failing to create new law in Nevada, you would be setting up a new framework that's not in the statute. It would have been so easy for the Nevada legislature to say unless they're overpaid, but they didn't. The only thing in the record of a comparable peer is Bali. More important, the whole premise of the argument here, factually, leave aside the law for a minute. The whole premise is these directors get paid as much as the employees, but they left out their equity compensation. They don't get paid remotely as much as the employees. They get paid a fraction. And although you, Judge Kleinfeld, said, you know, maybe you have to pay more to get people in the business because you're selling slot machines, it also happens to be perhaps the most regulated business in the United States. You can argue about companies subject to the FDA. But to get approved by the Nevada Gaming Commission and to be subject to that scrutiny, you have to be purer than Caesar's wife and produce a lot of information. So it's not a shock that Bali directors get paid about the same amount. Your Honor said you could understand from other cases you've seen $12,000 or $13,000 for a meeting. In here, the number that they used was $17,000 per meeting, but they left out all the committee meetings. Well, you could have said we're going to do it based on how many annual meetings you attend, and they're being paid $400,000 per annual meeting. If you're going to look, that's why the director's comp is different. They get paid per meeting. They had a lot of audit committee meetings. So again, to close and return the remainder of my time, the standard is abuse of discretion. Judge Reed could not have been more careful, and he gave them an opportunity to amend. There were four plaintiffs. Three of them didn't amend and went away. Let me ask you that. You recited what I think is our case law on this point, that the standard is abuse of discretion. The fact that we would review a district judge on a motion to dismiss based on abuse of discretion makes zero sense to me. I just respectfully, Judge Fletcher, I disagree. It makes total sense here because this is not your usual 12B6 motion. It is a 12B6, right? It's a 12B6, but it's a different standard by statute. You're sitting in diversity. You're applying Nevada law. Nevada law applies a higher standard to plea demand futility, as does Delaware. So it's not like ---- That doesn't get to my point. I mean, I understand that there's a judgment call in terms of what the standard is that these people have to satisfy in terms of futility and so on. But it's absolutely basic Hornbook law under 12B6 that we review it as a de novo. Well, your brothers in Silicon Graphics didn't feel that way because they ---- Well, I understand that perfectly. And I'm wondering whether we should go en banc to consider that question, because I think we just have it wrong. I was thinking of the same thing. A sua sponte en banc call, fraud has a higher standard under Rule 9, and it requires some judgment to decide whether fraud is adequately pleaded. And now with Iqbal, I guess there's some judgment involved in everything, deciding what's plausible, but still we review de novo. Demand futility is more like fraud than it is like a normal allegation in the court. But in any event, this would be a poor case in which to seek an en banc review of that because the outcome doesn't matter. So if you're looking for a case in which to overturn that footnote in Silicon Graphics, you should find one in which you would rule differently de novo than you would in an abuse of discretion. But we would oppose en banc review here on the ground that even under de novo review, there's no authority in any Delaware or Nevada court ever excusing demand because the directors got paid a lot, ever. Thank you, Your Honor. Thank you. Let's start out with a minute. We'll make sure you get a chance to say what you need to say. Sure. I only have a couple of very quick points in response to defense counsel. First, again, I'd like to go back to Bally's, the comparable company that defense counsel has pointed to. First of all, that's an analysis that's been brought in by the defendants, only by the defendants. And again, if the court refers to the reply brief, it will see that IGT's own self-admitted peers pay far less in director compensation than IGT. Even putting that aside, the only reasonable inference is that, which must be drawn in favor of the plaintiffs. Now, we're on 12B-6. I think if I went deep into this case, I would know exactly this. How is it that we know what the Bally directors are getting? The defendants submitted a portion of the Bally's proxy that shows what the Bally's non-employee directors get, which is comparable to what the ---- And you're willing to stipulate that that's true? Sure. Okay. Yes, because ---- On a 12B-6 motion, I thought what happened when people submitted extraneous evidence that was outside the complaint on a 12B-6 is a district judge could elect to treat it as a summary judgment motion. And if he did, he had to give notice to the parties so both parties could do what discovery might be necessary and submit evidence. I don't understand, actually, why we're looking at anything but the complaint. The ---- At the lower court level, the defendants introduced that evidence in connection with their reply brief. There was no hearing held in connection with the motion to dismiss. We never got an opportunity to make an argument to the district court regarding the evidence or purported evidence about Bally's. There was no motion to strike it? No, there was no motion to strike it. But, again, there was no hearing. And based on the Court's opinion, it's uncertain whether or how much the Court took into account the information regarding Bally's, because it's not mentioned in the opinion. But for purposes of this argument, again, the plaintiffs are entitled to all reasonable inferences. And the reasonable inference, the only reasonable inference that could be drawn from that is that Bally's and IDT are competing with each other to bring in directors, and they want to pay a very high amount so that they incentivize the directors to take the job and to keep the job. But to come back to a point, I asked and you answered it, but I don't want to make sure I understood your answer and you would have understood my question. For purposes of our decision, you're willing to stipulate and have it as an allegation that we must treat as true that that Bally compensation is accurately stated? No. I'm simply not disputing what is on the papers. But it's not an allegation that's been made in the case. It's not within the four corners of the complaint. I understand that. But what I'm asking is somewhat different, and that is, do you stipulate that it's true for purposes of the question in front of us, or do you want to say, listen, it's just not in front of us and that's just totally irrelevant? Then I'm going to say it's not in front of the Court and it's irrelevant. Yeah. Okay. Can you keep it from being in front of us if you didn't make a motion to strike it below? Perhaps the Court would allow us to make supplemental briefing on that point. But we did not make a motion to strike it at the Court below. Okay. The second point that I'd like to make is that defense counsel talked about the Nevada legislature and about what a board's right is in terms of paying directors. The board is free to pay itself however it sees fit within the bounds of ordinary business judgment. That's not the issue. The plaintiff has never alleged that there was a separate independent breach of fiduciary duty based purely on the board's decision to pay director fees that are high. The issue is that the board has to sleep in the bed that it makes. The board has to understand that it's free to pay itself whatever it wants. But if it does, it's going to give shareholders a reason to doubt their independence. That's the point. I suspect that the reason that directors pay is ordinarily not a basis for excusing a demand is that directors have a fiduciary obligation to the shareholders. And if they pay themselves more than is customary and usual, they have to reasonably fear a lawsuit for breach of their fiduciary duty for looting the corporation. That's certainly a rationale. And, again, the Delaware courts have repeatedly said, and it's not just in the national auto case that counsel talked about. In our brief, we quote the same language in Orman v. Cullman and in A.R. DeMarco Enterprises v. Ocean Spray Cranberries. All that the Delaware court has said is that if a fee can be shown to exceed what is a usual or customary director's fee, that can be reason to doubt the director's independence. Thank you, Your Honor. Thank you. Thank both sides for your arguments. The case of Visrani v. Bittman, now submitted for decision. The next case on the argument calendar, Rolland v. Cook.
judges: Hug, Kleinfeld, Fletcher